## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LORETTA L. CANOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3065 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENTATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Loretta L. Canoy appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Canoy filed Plaintiff's Motion for Summary Judgment (d/e 16).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 20).  Plaintiff filed Reply Brief (d/e 22).  The matter is before the Court for a Report and

---

[1] The Court takes judicial notice that Kilolo Kijakazi is now Acting Commissioner of Social Security and is automatically substituted in as the proper party Defendant.  Fed. R. Civ. P. 25(d).

Recommendation.  For the reasons set forth below, this Court recommends

that the Decision of the Commissioner should be REVERSED and

REMANDED.

## STATEMENT OF FACTS

### Background

Canoy was born on October 26, 1962.  She completed the sixth

grade and worked as a pantry goods maker at a convenience store.  She

stopping working at the level of substantial gainful activity on or about July

13, 2013.  Canoy suffered from degenerative changes of the lumbar spine,

lumbar stenosis, chronic obstructive pulmonary disease (COPD),

depression, and anxiety.  She alleged she became disabled on July 1,

2013 (Onset Date).  Canoy was last eligible for DIB on March 31, 2018

(Last Date Insured).  Certified Transcript of Proceedings Before the Social

Security Administration (d/e 12) (R. or Record)), at 13, 16, 33, 62, 87, 268,

371.

### Evidence Submitted Before the Evidentiary Hearing

On October 16, 2013, Canoy went to the Emergency Room at St.

John's Hospital in Springfield, Illinois (St. John's) complaining of right hip

pain.  She wanted a prescription for pain medication and said her primary

care physicians would only prescribe NSAID pain medications including

meloxicam.  Canoy rated her pain at 9/10 and had an existing active

prescription for hydrocodone/acetaminophen 5/325 mg (Norco).  R. 395.

On examination, she had full range of motion and normal stability and

muscle strength, muscle tone and she could ambulate without assistance.

The Emergency Room physician gave Canoy one dose of tramadol

(Ultram) and told her to contact her primary care physician for control of her

chronic hip pain.  R. 398.

On December 21, 2013, Canoy went to St. John's Emergency Room.

She was intoxicated and reported that she had been drinking heavily.  She

asked to see a psychiatrist and said she had a history of depression and

anxiety.  Canoy took alprazolam (Xanax) for anxiety, but she was out of her

medications and reported that she did not want to go home because "she

was afraid she might kill someone."  She said she could not afford her

medications and did not take them.  R. 435.  On examination, Canoy was

alert, oriented, and in no acute distress; she had normal range of motion;

her mood and affect were anxious and intoxicated and her blood alcohol

level was .302.  Canoy denied suicidal ideations, but she stated that she

was homicidal.  She stated that she wanted to hurt anyone who got in her

way, but she did not have a specific person she wanted to harm.  The

Emergency Room physicians' assistant Brandi Abbiatti, P.A., placed Canoy

on a Level 2 psych hold and administered lorazepam (Ativan), an
antianxiety medication.  R. 437.  Canoy went to sleep and after she awoke
and was no longer highly intoxicated, she did not want to harm herself or
others.  She was discharged and told to follow up with her physician.  R.
437, 440.

On August 28, 2014, Canoy went to St. John's Emergency Room with
thoughts of suicide.  She had chronic back pain that radiated into her left
leg and depression.  She had "no money," "no reason to live," and
"thoughts of suicide."  Canoy rated her pain at 9/10.  R. 444.  On
examination, Canoy was alert, oriented, and in no apparent distress; she
had a positive straight leg raising test for her left leg; her mental status was
anxious and depressed.  R. 446.  Canoy admitted that she was not suicidal,
but just wanted some help for her back so she could go back to work.  R.
453.  An MRI of her lumbar spine showed multilevel lumbar spine
degenerative disc disease/spondylosis causing some central canal stenosis
and foraminal narrowing, and an interval resection of a left L4-5 synovial
cyst.  R. 452.  The Emergency Room physician, Dr. Dr. Mark Mitchell, D.O.,
assessed low back pain possibly associated with radiculopathy, lumbar
canal stenosis, and acute depression.  He prescribed seven-day courses of

Xanax for anxiety and Norco for pain, and referred Canoy to a spine surgeon.  R. 453.

On September 9, 2014, Canoy went to St. John's Emergency Room for increased back pain.  She could not sit or stand without pain and rated her pain at 8/10.  She reported exacerbating her back pain when she carried groceries up five flights of stairs and said her next appointment with a primary care provider was September 17, 2014.  She denied any suicidal or homicidal ideations.  R. 464.  On examination, Canoy was alert, oriented, in no apparent distress, and had a normal affect; her lumbar back was tender; straight leg testing was negative; and she had normal range of motion, normal strength, and a normal neurological exam.  Nurse practitioner Becky Milan, CPNP, assessed chronic low back pain and gave Canoy two Norco tablets.  R. 467.  Milan also gave Canoy a prescription for an NSAID ibuprofen (Motrin) and a muscle relaxer cyclobenzaprine.  R. 468.

On November 20, 2014, Dr. Koteswara Narla, M.D., administered a L4-5 right sided transforaminal lumbar epidural steroid injection.  R. 478.

On January 14, 2015, Canoy went to St. John's Emergency Room complaining of neck and back pain and reported that she had problems with her insurance and could not get her pain medication.  She rated her

pain at 10/10.  R. 482.  On examination, Canoy had full range of motion and normal stability, muscle strength, and muscle tone.  Dr. Pramila Venigalla, M.D., refused to prescribe pain medication and told her she would need to see her primary care physician.  Canoy left against medical advice.  R. 485.

On February 24, 2015, Canoy went to St. John's Emergency Room complaining of chest pain accompanied with shortness of breath and rated her pain at 4/10.  R. 491.  On examination, Canoy was alert, oriented, and in no apparent distress; she had a normal affect; her heart examination was normal; and she had normal range of motion.  R. 494.  A chest x-ray was normal.  Stress test results were normal, and an EKG did not show any abnormalities.  Canoy was discharged when her chest pain resolved.  Dr. Venigalla gave her a prescription for Ativan because she said she was out of her anxiety medications.  R. 497.

On March 1, 2015, Canoy went to St. John's Emergency Room with chest pain.  Canoy said she had the pain for two months, but her chest also started pounding that evening and she rated her pain at 5/10.  The pain was worse at rest and started after she received an epidural injection in November 2014.  R. 509.  On examination, Canoy was alert, oriented, and in no apparent distress; her chest, respiratory, and heart examinations

were normal, and she had normal range of motion; she had a normal affect. R. 512. Canoy recently had a normal stress test and her blood tests and EKG showed no sign of a heart attack. Emergency Room physician Dr. John Byrnes, M.D., prescribed acetaminophen/codeine 300/30 mg (Tylenol #3 with codeine) and discharged her. R. 513.

On March 9, 2015, Canoy went to St. John's Emergency Room with left ear pain. She had developed a sore throat and left ear pain the night before, reported dizziness when she stood up or lay down, and had an intermittent headache. R. 521. On examination, Canoy was alert, oriented, and in no apparent distress; her ear and throat examination were normal; and she had a normal affect. R. 525. A head CT scan was negative for any abnormality. R. 531. Her neurological exam showed no focal deficits. Canoy felt better after taking a dose of lorazepam. R. 527. The Emergency Room physician, Dr. Tazeen Alhaz, M.D., stated that Canoy had uncontrolled anxiety and her medical records showed that she was admitted to the psych floor at Memorial Medical Center in Springfield, Illinois (Memorial) in January 2015 and was discharged on January 27, 2015. Dr. Alhaz stated,

> It appears that she has been dependant (sic) on benzodiazepines and plan was to manage her anxiety and depression with SSRI. She has not been taking Celexa due to undesirable side effects (clenching of mouth with its use?).

> She has taken Lexapro in the past and wants to be on a
> combination of Lexapro and Ativan.
>
> Discharged on Ativan 2 mg TID/prn for 5 days. Recommend
> following up with PCP [primary care physician] and/or psych as
> she needs to be started on SSRI. I highly recommend that she
> should not be given benzodiazepines as an outpatient and her
> anxiety and depression should be managed with SSRI's.

R. 528.[2]  She was discharged from the Emergency Room.  R. 528.  The

Record does not contain any other information regarding the January 2015

admission at Memorial.

On March 26, 2015, Canoy went to St. John's Emergency Room

because she ran out of her antianxiety medications.  She denied any

homicidal or suicidal ideations, or any hallucinations.  R. 532.  On

examination, Canoy was alert, oriented, and intermittently anxious with

frequent experiences of worry; she moved all extremities within normal

limits, and she had normal muscle tone.  The Emergency Room physician,

Dr. Peter Kieffer, M.D., prescribed lorazepam and excitalopram (Lexapro)

and discharged her.  R. 534-35.

On May 22, 2015, Canoy went to St. John's Emergency Room to

have her medications refilled.  She ran out of her blood pressure and

antianxiety medications seven days earlier, she could not eat or drink for a

---

[2] SSRIs are serotonin reuptake inhibitors.  This class of drugs is used to treat depression, anxiety, and
other mood disorders.  www.fda.gov/drugs/information-drug-class/selective-serotonin-reuptake-inhibitors-
ssris-information, viewed August 9, 2021.

few days, and she was anxious about a planned trip that was upcoming.  R.

536.  On examination, Canoy was alert, oriented, and in no apparent

distress; she had normal range of motion.  R. 539.  The Emergency Room

physician's assistant, Bailey Flip, P.A., refilled her medications.  R. 540.

On June 22, 2015, Canoy went to St. John's Emergency Room.  She

stated she was between doctors and had been having her prescriptions

refilled at the Emergency Room and she ran out of Ativan.  She denied any

homicidal or suicidal ideations and said she planned to move to Mount

Vernon, Illinois.  R. 546.  On examination, Canoy was alert, oriented, and in

no apparent distress; her mental status was anxious; and she was tearful

during the examination.  The Emergency Room physician, Dr. Geoffrey

Bland, M.D., gave Canoy one Ativan pill by mouth before discharge and

gave her a prescription for a three-day supply of clonazepam (Klonopin).

He told Canoy to find a physician in Mount Vernon as soon as possible.  R.

549.

On April 28, 2016, Canoy went to St. John's Emergency Room

because she had been out of her medications for four days and had a

panic attack.  She was feeling more anxious, had problems sleeping, and

was "more weepy."  She denied any homicidal or suicidal ideations.  R.

551.  On examination, Canoy was alert and oriented; she had no gross

motor deficits and normal range of motion; her mental status was anxious. Emergency Room physician's assistant Filip gave Canoy one mg of Ativan and prescribed a short duration prescription for clonazepam and Venlafaxine for the weekend.  R. 555.

On May 2, 2016, Canoy saw psychiatrist Dr. Richard Schenkelberg, M.D., to establish care.  Canoy was having severe panic attacks and her previous doctor prescribed Effexor.  She reported low energy and easy fatigability and that she had chronic problems falling asleep for years.  She indicated that she had agoraphobia and that she felt depressed all her life. She denied any suicidal thoughts, and stated her goal was to get her own apartment and get on disability.  She denied symptoms of mania or psychosis.  R. 748.  On examination, Canoy was alert, oriented, and in no acute distress; her mood was depressed, and her affect was restricted and tearful; she had normal eye contact and regular speech.  Her psychomotor was normal, her thought processes were linear, her thought content was normal, her insight and judgment were fair, her concentration was normal, and her recent and remote memory were intact.  Dr. Schenkelberg assessed generalized anxiety disorder, PTSD, panic disorder with agoraphobia, major depressive disorder, nicotine dependence, and personality disorder not otherwise specified with cluster B traits.  Dr.

Schenkelberg assigned a Global Assessment of Functioning (GAF) score of 50 and stopped Canoy's lorazepam prescription, and prescribed Klonopin and Venlafaxine.  R. 750-51.

On June 7, 2016, Canoy saw Dr. Schenkelberg for a follow up.  R. 745.  Her depression was improved; she felt happier and more content.  Dr. Schenkelberg noted that Canoy had a brighter and reactive affect; her energy and motivation were better; her appetite was good, and her anxiety was not as bad as it was; her sleep improved.  She denied having any recent panic attacks and denied having any side effects from her medications.  R. 745-46.  On examination, Canoy was alert, oriented, and in no acute distress; her mood was good, and her affect was full.  She had normal eye contact, regular speech, normal psychomotor, linear thought processes, normal thought content, good insight and judgment, normal concentration, and intact recent and remote memory.  Dr. Schenkelberg assessed the same condition as the initial appointment, but he assigned a GAF score of 65. R. 746.

On June 13, 2016, Canoy saw Dr. Swapna Allamreddy, M.D., to establish care.  R. 386-89.  She complained of anxiety and back pain that radiated down her right leg.  R. 386.  On examination, Canoy was alert and

oriented; she had a normal affect; she had a normal gait and normal joints, bones, and muscles.  R. 388.

On July 10, 2016, Canoy went to St. John's Emergency Room complaining of radicular leg pain.  The pain was worse after she helped a friend move some boxes and she could ambulate with a cane.  R. 557.  On examination, Canoy was alert, oriented, and in mild distress; she had a normal affect; she had negative straight leg tests and no restriction of passive range of motion.  She was able to ambulate and had no weakness in her calves and she had 4/5 muscle strength bilaterally, but poor effort was noted as likely.  R. 563.  She received an injection of the NSAID ketorolac tromethamine (Torodal) and one Norco tablet at the Emergency Room.  Dr. Trenton Grimm, M.D., assessed low back pain potentially associated with radiculopathy and prescribed Torodal tablets and Norco tablets.  R. 562.

On July 22, 2016, Canoy went to St. John's Emergency Room with chest pain. She felt dull pressure on her left chest that radiated into her back and left shoulder, and she had a stabbing pain in her right chest.  Canoy rated her pain at 6/10.  R. 563.  On examination, she was alert, oriented, and in no apparent distress; she had a normal affect; she had full range of motion in her back and neck and normal range of motion

generally; and she had chest wall tenderness on the left.  R. 567.  Canoy's EKG and blood test were negative.  She left the Emergency Room against medical advice.  R. 569.

On August 26, 2016, Canoy called Dr. Schenkelberg's office to request an increase in the dosage of her Klonopin.  She reported that she cried all the time and was very irritable.  Canoy said that "she could rip someone's head off", was not sleeping, and was cranky.  Dr. Schenkelberg increased her dosage of Effexor and Klonopin.  R. 860.

On September 7, 2016, Canoy went to St. John's Emergency Room complaining of back pain and left hip pain from a fall two days earlier. She rated her pain at 9/10.  R. 588.  On examination, Canoy was alert, oriented, and in no apparent distress; she had full range of motion, and no gross motor deficits.  R. 592, 596.  A chest x-ray was normal.  R. 595.  X-rays of the pelvis and left hip showed no acute fracture or dislocation.  R. 596.  An x-ray of the lumbar spine showed spondylosis, acute mild compression fracture of the superior plates of L1 and L3, and no traumatic malalignment. R. 597.  Dr. Charles Pennix, M.D., assessed hip pain, closed vertebral fractures at L1 and L3, acute lumbar back pain, and the fall as the cause of the injury.  Dr. Pennix found that her condition had improved and was

stable. He prescribed ibuprofen, Norco, and methocarbamol (Robaxin); and discharged her from the Emergency Room. R. 598.

On October 19, 2016, Canoy saw advanced practice nurse Jaime Jensen-Cole, APN, in Dr. Schenkelberg's office. She felt better after Dr. Schenkelberg increased the dosage of her medications in August 2016. Canoy reported that she fractured two vertebrae in her back, and after this injury she reported increased agitation, anger, and tearfulness in her mood. She also reported low motivation, low energy, decreased appetite, and increased anxiety and her panic attacks decreased in intensity and frequency. She had no nightmares and no suicidal ideations. R. Canoy said she had difficulty with transportation and she usually walked or rode the bus to her appointments. R. 742.

On examination, Canoy was alert, oriented, and in no acute distress; her mood was anxious; her affect was full; her eye contact and speech were normal; her thought processes was linear and her thought was normal; her insight and judgment were good; her concentration was normal; her recent and remote memory were intact; her gait and station were normal; and her fund of knowledge was normal. R. 742-43. Jensen-Cole assessed anxiety, generalized anxiety disorder, major depression

chronic, panic disorder with agoraphobia, and PTSD, recommended

counseling, and renewed Canoy's medications.  R. 743-44.

Canoy asked Jensen-Cole for a letter stating she was unable to work

due to a combination of her mental and physical disorders.  Jensen-Cole

relayed the request to Dr. Schenkelberg, who said that the letter would not

be appropriate if her psychiatric condition was stable and her problems

were more related to her physical impairments.  Jensen-Cole responded

that Canoy was more anxious with a lower mood due to situational stress.

Dr. Schenkelberg authorized Jensen-Cole to write the letter.  R. 859.

On October 20, 2016, advanced practice nurse Jensen-Cole wrote a

letter to Capitol Township.  The Court takes judicial notice that Capitol

Township is a municipality in Sangamon County, Illinois.  Jensen-Cole

stated that Canoy was under his care for generalized anxiety disorder,

panic disorder, major depressive disorder, and PTSD.  Jensen-Cole stated,

in part:

> She has had an increase in depressive symptoms and anxiety
> tied to situational stressors.  Her medications are being
> adjusted to target depressive symptoms.
>
> She is currently not able to work and is seeking disability for
> chronic back pain related to spinal stenosis and cervical
> radiculopathy.

R. 740.

On November 15, 2016, Canoy saw state agency psychologist Dr. Dolores Trello, Psy.D., for a mental status examination.  R. 619-23.  Canoy provided all the information on which Dr. Trello based her examination. She came Dr. Trello's office by bus; her communication was easily understood; she reported that she suffered from anxiety, depression, panic attacks, agoraphobia, and PTSD; and she reported she had degenerative disc disease, sciatica, spinal stenosis, asthma, chronic pain.  Canoy liked to bake, watch television, and play computer games on her phone.  She got up between 4:00 a.m. and 7:00 a.m. and went bed between 6:00 p.m. and 7:00 p.m.; she microwaved food, performed her own self-care, did laundry, washed dishes, and folded laundry; her brother drove her to do shopping as she did not drive; she did not pay bills and was not good at handling money.  R. 619-20.

On examination, Dr. Trello observed that Canoy was oriented and had a normal affect.  She displayed no evidence of hallucinations, delusions, psychosis, or thought disorder.  Her immediate, recent, and remote memory were intact and she was well informed.  She could not do serial sevens, but she could do serial threes; she could provide abstract meanings to simple proverbs; and she attempted to provide solutions to hypothetical situations.  Dr. Trello assessed generalized anxiety disorder,

panic disorder with agoraphobia, PTSD, major depressive disorder with moderate severity and without psychotic features. R. 622.

On January 15, 2017, Canoy went to St. John's Emergency Room. Canoy reported that she fell while moving a trunk and she rated her pain at 8/10.  R. 636.  On examination, Canoy was alert, oriented, and in mild distress; she had a normal affect; she had normal range of motion, and mild tenderness over the muscles in her left arm.  R. 640.  Emergency Room physician Dr. Mark Massoud, M.D., prescribed Norco and Metaxalone, as well as Advil.  R. 641.

On January 30, 2017, state agency psychologist Dr. M.W. DiFonso, Psy.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment for Canoy.  R. 68-70, 73-5.  Dr. DiFonso found that she had depressive and anxiety disorders and opined that she was mildly limited in her ability to understand, remember, and apply information, and in adapting and managing herself; and moderately limited in her ability to interact with others and concentrate, persist, or maintain pace.  R. 68.  Dr. DiFonso found that Canoy was moderately limited in her ability to understand, remember, and process detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and accept instructions and respond

appropriately to criticism from supervisors.  R. 74-75.  Dr. DiFonso concluded that Canoy's "cognitive and attentional skills are intact and adequate for simple one-two step as well as multiple step tasks."  Dr. DiFonso said she was "capable of multi-step productive activity w[ith] modified social demand."  R. 75.

On February 1, 2017, state agency physician Dr. Julio Pardo, M.D., prepared a Physical Residual Functional Capacity Assessment of Canoy. Dr. Pardo opined that she could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds.  Dr. Pardo opined that Canoy should avoid concentrated exposure to extreme cold and heat; wetness; humidity; fumes, odors, dusts, gases, and poor ventilation; and hazards.  R. 71-73.

On February 20, 2017, Canoy saw Dr. Schenkelberg.  R. 734-36.  Dr. Schenkelberg noted that Canoy had missed several appointments and he had sent her a final warning letter.  Canoy reported stress from acute diverticulitis and problems with her roommate.  She said she had been very aggressive and irritable with mood swings and reported that she grabbed her roommate by the face that morning.  Canoy was feeling more

depressed with low energy and low appetite.  Her anxiety was also worse

and she had some trouble getting to sleep, but medication controlled her

nightmares.  She had panic attacks often, but she did not go to therapy

because she did not have a car.  A friend drove her to Dr. Schenkelberg's

office.  On examination, Canoy was alert, oriented, and in no acute

distress; her mood was anxious and depressed, and her affect was

restricted and tearful; she had normal eye contact, regular speech, and

normal psychomotor; her thought processes were linear; her thought

content was normal; her insight and judgment were good; her recent and

remote memory were intact; her neurologic exam was grossly normal; and

her gait and station were normal. R. 734-35.  Dr. Schenkelberg assessed

generalized anxiety disorder, PTSD, panic disorder with agoraphobia,

major depressive disorder, personality disorder not otherwise specified with

cluster B traits.  He assigned a GAF score of 55-60.  R. 735.  Dr.

Schenkelberg changed her medication dosages, referred her for therapy,

and encouraged regular exercise.  R. 736.

On March 6, 2017, Dr. Schenkelberg wrote a letter to Capitol

Township.  The body of this letter was the same as the October 20, 2016

letter that advanced practice nurse Jensen-Cole wrote to Capitol Township.

R. 733.

On April 28, 2017, Canoy called Dr. Schenkelberg's office, cancelled her appointment with him, and rescheduled for May 1, 2017.  The receptionist who took the called recorded that Canoy stated, "Please do not terminate.  Pt has to take bus, has no money to pay 2.50 for bus fair, and also the threat of storms today and has to walk 2 blocks from the bus stop."  R. 732.

On May 2, 2017, Dr. Schenkelberg sent a letter to Canoy terminating his care of due to her missing seven appointments from June 2, 2016 through May 1, 2017.  R. 731.

On May 16, 2017, a representative of Dr. Schenkelberg's office returned Canoy's telephone call.  Canoy reported that she had moved into an apartment building that provided transportation and she asked to be reinstated as a patient.  She stated that she missed her appointments due to lack of transportation and also said she had been "in hospital from stress."  Dr. Schenkelberg agreed to reinstate her, but she was warned that she would be terminated as a patient the first time she was a no-show for an appointment.  Dr. Schenkelberg also renewed her prescription for venlafaxine.  R. 857-58.

On June 9, 2017, Canoy went to St. John's Emergency Room for back pain.  She recently moved to a new residence and moving involved

"strenuous exertion."  She rated her pain at 10/10.  R. 796.  On
examination, Canoy was alert, oriented, and in no apparent distress; her
affect was anxious and tearful; and her right lumbar region was tender.  R.
800.

On September 9, 2017, Canoy went to St. John's Emergency Room
for a refill on her prescriptions.  She said her psychiatrist had dropped her
as a patient in August 2017 for missing one appointment.  She reported
she had agoraphobia and just could not leave her home sometimes for an
appointment.  She denied having any physical symptoms or problems.  R.
809.  On examination, Canoy was alert, oriented, and in no apparent
distress; her mood and affect were normal; her back was not tender, and
she had normal range of motion generally.  R. 812.  The Emergency Room
staff gave Canoy one clonazepam tablet and one tablet of her blood
pressure medication.  R. 812-13.

On November 7, 2017, Canoy saw state agency psychologist Dr.
Michael Trieger, Psy.D., for a psychological evaluation.  As part of the
evaluation, Dr. Trieger reviewed Dr. Trello's report, medical records, and
Canoy's Function Report.  R. 761.  A friend drove Canoy to the
appointment.  Dr. Trieger noted,

> She transferred from the waiting room to the exam room,
> without evidence of difficulty or discomfort, but she stated she

experiences chronic pain from degenerative disc disease,
sciatica and spinal stenosis. …  Ms. Canoy made good eye
contact, was cooperative in attitude and appeared to
comprehend most questions put to her.

R. 761.  Canoy said her physical health problems exacerbated her
depression.  She reported staying at home, sleeping often, and suffering
from frequent panic attacks, especially when she left her home.  She had
been hospitalized three times for psychiatric care and said Xanax and
Effexor helped her condition.  Canoy denied any delusions or
hallucinations, and she denied she has homicidal or suicidal ideations.  She
lived alone and had no problems keeping her apartment clean.  R. 762.

On examination, Canoy was cooperative, her mood and affect were
downcast and anxious; her speech was normal, and her statements were
relevant, coherent, and adequately organized; she was oriented and her
recent and remote memories were intact.  She remembered and repeated
five out of five words; she refused to try serial sevens or serial threes; her
judgment was impulsive; her verbal reasoning skills were adequate; and
her attention and concentration were marginally focused during the
interview.  Dr. Trieger assessed depressive disorder not otherwise
specified and panic disorder with agoraphobia.  R. 762-63.

On November 8, 2017, state agency psychologist Dr. Russell Taylor,
Ph.D., prepared a Psychiatric Review Technique and a Mental Residual

Functional Capacity Assessment.  R. 129-31, 135-36.  Dr. Taylor assessed

Canoy with depressive disorders and anxiety disorders and opined that she

was mildly limited in her ability to understand, remember, or apply

information, and adapt or manage oneself; and moderately limited in her

ability to interact with others and to concentrate, persist, or maintain pace.

R. 129.  Dr. Taylor opined that Canoy was moderately limited in her ability

to understand, remember, and carry out detailed instructions; maintain

attention and concentration for extended periods; interact appropriately with

the general public; and accept instructions and respond appropriately to

criticism from supervisors.  R. 135-36.  Dr. Taylor concluded:

> The clmt retains the mental capacity to understand, remember
> and concentrate sufficiently in order to carry out one or two-
> step instructions for a normal work period. She could make
> simple work related decisions. She could interact with others
> sufficiently in a work setting with reduced social demands. She
> could adapt to routine changes and pressures in the work
> environment.

R. 136.

On November 11, 2017, state agency physician Dr. Prasad Kareti,

M.D., prepared a Physical Residual Functional Capacity Assessment of

Canoy.  R. 112-14.  Dr. Kareti opined that she could occasionally lift 20

pounds and frequently lift 10 pounds; stand and/or walk for six hours in an

eight-hour workday; sit for six hours in an eight-hour workday; frequently

climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds. Dr. Kareti opined that Canoy should avoid concentrated exposure to extreme cold and heat; wetness; humidity; fumes, odors, dusts, gases, and poor ventilation; and hazards. R. 112-14.

On December 31, 2017, Canoy went to St. John's Emergency Room. She reported she had homicidal ideations because her brother died because an individual gave him a heroin overdose. Canoy knew the identity of the individual who administered the overdose and had homicidal ideations about killing the individual. She had chest pains the night before, nausea, vomiting, and no appetite. She denied any shortness of breath. She said she had a history of PTSD, anxiety, depression, COPD, and hypertension and was not taking any medications. The emergency room physician Dr. Janda Stevens, M.D., assessed the severity of Canoy's current condition as mild. R. 815. On examination, she was alert, oriented, and in no apparent distress; her mental status was tearful and distressed; she had normal range of motion, normal respiratory examination, and normal heart examination. Her EKG was normal. Dr. Stevens gave Canoy one dose of ondansetron (Zofran), two doses of Ativan, and an injection of Torodal. R. 819-20. Dr. Stevens discharged Canoy from the Emergency Room when she felt better and assessed a grief reaction. R. 824-25.

On January 29, 2018, Canoy went to St. John's Emergency Room complaining of a toothache with pain and swelling.  She said her primary care physician dropped her when she made statements against the primary care physician and she could not refill her medications.  She had not had venlafaxine for two months and rated her pain at 8/10.  R. 828.  On examination, Canoy was alert, oriented, and in no apparent distress; she had full range of motion; she had no gross motor deficits, normal gait, no motor weakness, no sensory deficit, and no speech abnormality; her mental status was anxious and tearful.  R. 831-32.  Emergency room physician Dr. Rebecka Lopez, M.D. prescribed a short course of clonazepam and advised Canoy to establish care with a new primary care physician.  R. 832.

On March 26, 2018, Canoy went to St. John's Hospital Emergency Room complaining of anxiety and stated she had been out of her medications for four months.  The remaining hospital record of this event is not included in the administrative record.  R. 766.

On April 17, 2018 Canoy went to the Emergency Room at Memorial complaining of left wrist pain radiating to the elbow and shoulder and swelling for a few months.  R. 843.  On examination, Canoy was alert, in no acute distress, and tearful; she was cooperative and appropriate in mood

and affect; she had normal range of motion in her back; she had no swelling generally.  Dr. Imran Hasanuddin, M.D., assessed cervical radiculopathy and prescribed an NSAID Flector Patch for pain as needed. R. 846.

On June 19, 2018, an MRI of Canoy's lumbar spine showed multilevel spondyloarthropathy most pronounced at L5-S1; an L5-S1 disc bulge causing mild spinal canal stenosis and a right subarticular/neural foraminal extrusion causing moderate to severe right neural foraminal stenosis in association with facet hypertrophy and ligament flavum thickening; and moderate left neural foraminal stenosis.  The MRI also showed the mild compression fractures at L1 and L3. R. 840.

### The Evidentiary Hearing

On December 14, 2018, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 28-61.  Canoy appeared with her attorney.  A vocational expert Mary Andrews also appeared.  R. 30.

Canoy testified first.  Prior to the Onset Date she worked as a cook in a Casey General Store and she had to lift items weighing over 50 pounds. R. 34-35.  Vocational expert Andrews testified that Canoy's job was classified as a pantry goods maker and that this job was generally performed at the light or medium exertional level.  Andres testified that

based on Canoy's testimony, Canoy performed the job at the heavy exertional level.  R. 37-38.

Canoy continued testifying.  She was single and had adult children. She lived in a high-rise apartment where the building was handicap accessible.  She did not have a driver's license and she had not driven in 20 years.  She relied on a friend to give her rides for transportation.  R. 40-41.  She used to ride the bus, but she did not anymore because she could not stand for 15 to 20 minutes at the bus stops waiting for the bus.  She completed the sixth grade in school.  R. 42.

Canoy testified that in a typical day, her first step caused "jerking pain in my buttock" and she had to sit for two to three hours to get her "body loosened up."  She made her bed and picked up her clothes, but she could not change sheets or stand to cook.  She ate "microwave food" and she leaned her elbows on the edge of the sink to wash dishes.  Canoy's neighbor washed her dishes if she had too many.  Her neighbor also mopped Canoy's floors, vacuumed, did the laundry, changed the sheets, and took out the garbage.  Canoy went to bed about 3:00 p.m. and she stayed her pajamas all day.  R. 43-44, 51.  She did not go out as she had agoraphobia and did not like being around people and having people look

at her.  R. 52.  She slept whenever she was tired.  She slept 15 hours a
day about 10 days out of a month.  R. 54.

Canoy estimated that she could stand for 15 minutes before she had
to move and she could walk for 20 minutes. R. 44-45.  She could lift 15
pounds.  R. 47, 54.  She could bathe and dress herself, but she was afraid
of falling in the shower.  She sometimes had difficulty washing her hair
because she could not keep her arms above her head.  She could not
squat or get down on one knee.  R. 53.

Canoy had constant back pain and rated her pain at 8/10 every day.
R. 53.  She said that the lumbar epidural injection she received helped her
hip but not her back and the injections helped for two or three months.  R.
46.  She could not get to physical therapy appointments because of a lack
of transportation. R. 46.  Canoy estimated that four days a week she did
not get out of bed because her back pain was so severe.  R. 54-55.

She used a cane to walk, but a doctor did not prescribe use of a
cane.  She used the cane to walk down the hall or to go to her mother's
apartment, located in the same building on a different floor.  She used an
elevator to get to her mother's floor.  She would need the cane to stand for
30 minutes and she did not use the cane to come to the hearing because
her friend dropped her right at the front door of the building.  R. 50, 52-53.

Canoy said she was hospitalized in 2014 or 2015 for mental problems and was on medications for her mental conditions.  R. 48-49.  She thought that her medications for her mental conditions were working and said the medication did not have any side effects.  R. 50.

Vocational expert Andrews then testified.  Canoy stipulated to Andrews' qualifications as an expert.  R. 56.  The ALJ asked Andrews the following hypothetical question:

> Q All right. For the first hypothetical, I'd like you to assume a hypothetical individual of the claimant's age, education and with that one past job we just discussed.  Further assume this individual can perform work at the light exertional level.  Can frequently climb ramps and stairs.  Can never climb ladders, ropes or scaffolds.  Must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, dust, odors, gases, poor ventilation, moving machinery and unprotected heights.  Could such a hypothetical individual perform the claimant's past work?

R. 56-57.  Andrews opined that such a person could not perform the pantry goods maker job as Canoy performed it, but the person could perform the pantry goods maker as generally performed in the economy per the United States Department of Labor's Dictionary of Occupational Titles (DOT).  R. 57.  Andrews opined that the person could also perform the job of carver, with 1,382 such jobs in the national economy.  R. 58.  A carver typically had a food handler's permit from the department of public health.  R. 58.

Canoy did not have a permit when she worked at the Casey's General Store.  R. 42.

Andrews opined that the person could not perform Canoy's past work if she was further limited to work that could be learned in 30 days or less with simple, routine tasks.  R. 58.  Andrews opined that the hypothetical person could not maintain employment if she was absent from work one and a half days a month.  R. 59.  Andrews said the person could not work if she needed a cane to stand or walk.  R. 60.  The hearing concluded.

<u>THE DECISION OF THE ALJ</u>

On March 18, 2019, the ALJ issued her report.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Canoy met her burden at Steps 1 and 2. Canoy had not engaged in substantial gainful activity since the Onset Date and she suffered from the severe impairments of degenerative changes of the lumbar spine, lumbar stenosis, and COPD.  R. 16.

The ALJ found that Canoy's compression fracture at L1 and L3 were non-severe and stated, "However, all of the claimant's documented symptoms and physical examination findings have been considered and accommodated in the residual functional capacity finding." R. 16.

The ALJ also found that Canoy had medically determinable mental impairments of depression and anxiety, but the mental impairments were not severe. The ALJ stated that her mental status examinations were normal, and her medical providers discharged her from care for not showing up for appointments. The ALJ noted Canoy's GAF scores were generally between 55 and 65 and that she typically walked or rode the bus to appointments. The ALJ stated:

> The claimant has not attended counseling and has not sought treatment at an emergency department or crisis center solely as a result of mental health issues, she has not required inpatient psychiatric hospitalization, and despite her allegations of debilitating symptoms, her mental status examinations are generally unremarkable.

R. 17.

The ALJ also found that the examinations by psychologists Drs. Trello and Trieger supported the conclusion that Canoy's mental impairments were non-severe. The ALJ noted that Dr. Schenkelberg said in October 2016 that Canoy's symptoms were stable and she seemed to be doing well when advanced practice nurse Jensen-Cole mentioned that

Canoy asked for a letter saying she was disabled.  The ALJ further found
that Jensen-Cole's October 20, 2016 letter contained a recitation of
Canoy's allegations that she was not able to work, not a medical opinion.
The ALJ further found that the opinion was inconsistent with Dr.
Schenkelberg's treatment records.

The ALJ gave little weight to the opinions of agency psychologists
Drs. DiFonso and Taylor because their opinions were inconsistent with the
treatment notes and inconsistent with the mental state examinations of Drs.
Trello and Trieger.  R. 18.  The ALJ found that Canoy had no limitations in
the areas of understanding, remembering, or applying information; and
interacting with others.  The ALJ found mild limitations in the areas of
concentrating, persisting, or maintaining pace; and adapting or managing
oneself.  R. 18-19.  The ALJ concluded that the mental impairments were
non-severe.  R. 19.

The ALJ found at Step 3 that Canoy's impairments did not meet or
equal a Listing.  R. 19.

At Step 4, the ALJ found that Canoy had the following RFC:

6. After careful consideration of the entire record, the
undersigned finds that the claimant has the residual functional
capacity to perform light work as defined in 20 CFR
404.1567(b) and 416.967(b) except she can frequently climb
ramps and stairs. She can never climb ladders, ropes, or
scaffolds. She must avoid concentrated exposure to extreme

cold, extreme heat, wetness, humidity, fumes, dusts, odors, gases, poor ventilation, moving machinery, and unprotected heights.

R. 20.  The ALJ relied on treatment notes that showed full range of motion, intact motor strength, and normal sensation.  The ALJ relied on the April 17, 2018 examination in the Memorial Emergency Room that showed normal range of motion, without swelling or focal deficits.  The ALJ noted that no medical records showed the use of an assistive device at a medical office visit.  The ALJ relied on the opinions of agency physicians Drs. Pardo and Kareti. R. 21.

The ALJ found at Step 4 that Canoy could perform her past relevant work as a pantry goods maker as the job was generally performed in the national economy.  The ALJ relied on the opinions of vocational expert Andrews and the RFC determination.  The ALJ concluded that Canoy was not under a disability. R. 22.

Canoy appealed.  On January 6, 2020, the Appeals Council denied her request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Canoy then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ failed to minimally articulate her analysis of the relevant evidence in determining that Canoy's mental impairments were non-severe.  The ALJ incorrectly said that Canoy had not been hospitalized for her mental impairments.  On March 9, 2015, Dr. Alhaz stated that a review of Canoy's medical records showed that she was admitted as an inpatient to the Memorial psych department for her mental impairments in January 2015.  R. 528.  On December 21, 2013, Canoy was put on a psych hold at St. John's Emergency Room; however, she was intoxicated at the time.  R. 437.  The ALJ's statement that she had not been hospitalized for her mental impairments was incorrect and could have affected her decision to find that Canoy's mental impairments were non-severe.

An error in determining that an impairment was non-severe is reversible if the ALJ failed to consider the non-severe impairment in formulating the RFC, "[T]he ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment.  A failure to fully consider the impact of non-severe impairments requires reversal." Denton v. Astrue, 596 F.3d 419, 423 (7th Cir. 2010) (internal citations omitted).  Here, the Court cannot tell if the ALJ considered Canoy's mental impairments in formulating the RFC.  At Step 2, the ALJ said she would consider the non-severe

Page **36** of **38**

compression fractures in formulating the RFC.  R. 16.  The ALJ made no

such statement with respect to Canoy's mental impairments.  Furthermore,

the ALJ made no mention of Canoy's mental impairments in the formulation

of the RFC.  The Court, therefore, cannot tell whether the ALJ considered

the mental impairments in the formulating RFC.  Canoy's mental

impairments could be material to her RFC because vocational expert

Andrews opined that Canoy could not perform her prior work if she was

limited to work that could be learned in 30 days or less with simple, routine

tasks.  R. 58.

Given that the ALJ did not minimally articulate all of the material

relevant evidence, the Court recommends that the decision be reversed

and remanded for further proceedings before the Social Security

Administration.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Loretta

Canoy's Motion for Summary Judgment (d/e 16) be ALLOWED; The

Defendant Acting Commissioner's Motion for Summary Affirmance (d/e 20)

be DENIED; and the decision of the Acting Commissioner should be

REVERSED and REMANDED for further proceedings before the Social

Security Administration pursuant to 42 U.S.C. § 405(g) sentence 4.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER:   August 9, 2021

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE